UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SYSTEMATIC POWER SOLUTIONS, LLC, d/b/a "XS POWER," | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-277-KAC-DCP |
| | ) | |
| FULLRIVER BATTERY MANUFACTURE CO., LTD., and FULLRIVER INDUSTRY CO., LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Orders [Docs. 54, 73, 76, and 78] of referral by United States District Judge Katherine A. Cryzter.

Now before the Court is Plaintiff's Motion for Entry of Default Judgment and for Hearing to Determine Plaintiff's Damages ("Motion for Entry of Default Judgment") [Doc. 53], Plaintiff's Motion to Voluntarily Dismiss Certain Claims [Doc. 69], Plaintiff's Motion to Recover Attorneys' Fees and Costs [Doc. 74], and Plaintiff's Supplement to its Motion for Entry of Default Judgment and Motion for Permanent Injunction ("Motion for Permanent Injunction") [Doc. 77].

By way of background, on April 6, 2023, the Court entered a Show Cause Order [Doc. 55], directing Defendants to appear before the undersigned on May 18, 2023, to show cause why a default judgment should not be entered. On May 17, 2023, Plaintiff filed a motion requesting that the hearing be continued, which the Court granted [Doc. 62]. The Court reset the hearing for June 22, 2023. On June 22, 2023, Attorney W. Michael Baisley appeared on behalf of Plaintiff. Defendants were not present. During the hearing, Plaintiff presented evidence regarding its

1

damages in this matter. Following the conclusion of the hearing, Plaintiff filed Proposed Findings of Fact and Conclusions on Damages ("Post Hearing Brief") [Doc. 71], its Motion to Voluntarily Dismiss Certain Claims [Doc. 69], its Motion to Recover Attorneys' Fees and Costs [Doc. 74], and its Motion for Permanent Injunction [Doc. 77].

For the reasons set forth below, the Court **RECOMMENDS** that the District Judge **GRANT IN PART AND DENY IN PART** Plaintiff's Motion for Entry of Default Judgment [**Doc. 53**], **GRANT** Plaintiff's Motion to Voluntarily Dismiss Certain Claims [**Doc. 69**], **GRANT** Plaintiff's Motion to Recover Attorneys' Fees and Costs [**Docs. 74**], and **GRANT IN PART AND DENY IN PART** Plaintiff's Motion for Permanent Injunction [**Doc. 77**].

I.    **BACKGROUND**

The Court will first summarize the allegations in this case and then turn to the procedural history.

A.    **Allegations**

Fullriver Battery Manufacture Co., LTD. and Fullriver Industry Co., LTD. ("Defendants" or collectively, "Fullriver") originally filed the Complaint in this matter [Doc. 1]. On August 9, 2019, Systematic Power Solutions, LLC d/b/a "XS Power" ("Plaintiff") filed its Answer and Counter-Complaint (hereinafter, "Counterclaim") [Doc. 15]. According to the Counterclaim, Plaintiff develops, designs, markets, and sells high-performance batteries throughout the United States and internationally [*Id*. ¶ 5]. Establishing its business in 2005, Plaintiff "is one of the largest market participants in the United States in the high-performance battery industry segment" and has a strong international presence [*Id*. ¶¶ 7, 8].

In July 2009, Plaintiff's predecessor entered into a written agreement ("16V Battery Agreement") with Defendants, wherein they agreed to manufacture and supply certain 16-volt

2

absorbed glass mat ("AGM") batteries to Plaintiff [*Id.* ¶ 10].[1] "Pursuant to the 16V Battery Agreement, [Plaintiff] invested substantial sums of money and collaborated with Defendants to design and construct the necessary tooling that would be used to manufacture certain models of [Plaintiff's] batteries" [*Id.* ¶ 11]. Plaintiff exclusively owns the tooling, and it is proprietary to Plaintiff [*Id.* ¶ 12]. Among other key terms, the parties agreed that the "tooling would be used for the purpose of manufacturing [Plaintiff's] batteries, and for no other purpose, without [its] prior consent" [*Id.* ¶ 13]. Other terms in the 16V Agreement included the following:

(A)     Requiring Fullriver to contact SPS before developing any new 16V battery models to be used in the performance automotive or car audio markets, in order to allow SPS to review the design and specifications of any proposed new model to protect SPS's trademarks and features;

(B)     Requiring Fullriver to establish a commission for any batteries produced for the performance automotive and car audio markets within the 20 to 100-pound range, as well as a commission for any batteries produced on the SPS's closed tool;

(C)     Prohibiting Fullriver from opening a 16V battery model in the range of 20 to 100 pounds that would be offered to Fullriver customers in the performance automotive and car audio markets;

(D)     Prohibiting Fullriver from opening a 16V battery model in the range of 20 to 100 pounds as a closed tool to any Fullriver customer that distributes to the performance automotive and car audio markets without notifying SPS; and

(E)     Permitting Fullriver to produce 16V batteries for other markets such as golf carts, floor scrubbers, telecom and any other market that does not interfere with the performance automotive and car audio markets for any other Fullriver customers in the performance automotive and car audio markets, and from opening tooling for any customer that would violate the terms of the Agreement.

---

[1]     While the Counterclaim does not define "AGM," Scottie Johnson testified during the evidentiary hearing that "AGM" means "absorbent glass mat" [Doc. 67 p. 52].

[*Id.* ¶ 14].

The Counterclaim alleges that Plaintiff has one brand, "XS Power," that is widely recognized internationally "in the high-performance and specialty battery industry, particularly in the realms of automotive performance, power sports, racing, and custom car audio" [*Id.* ¶ 15]. Plaintiff's battery designs are "unique and distinctive in the marketplace, distinguishing their visual image and overall appearance of its products in comparison with its competitors' products" [*Id.* ¶ 16]. These design components are non-functional, and Plaintiff "has expended significant resources to develop and design its battery products and to create in the public's mind an association between the visual appearance of its battery products and [its] brand, and to associate [it] as the manufacturer and source of those batteries" [*Id.* ¶ 18]. "[B]y virtue of their unique design, visual image, and overall appearance," the public recognizes Plaintiff's batteries, "which are readily distinguishable from [its] competitors' products" [*Id.* ¶ 19].

In early to mid-2016, Plaintiff learned that Defendants had begun, or was about to begin, manufacturing the 16-volt batteries for third parties, which is a direct violation of the 16V Battery Agreement [*Id.* ¶ 21]. Plaintiff expressed concerns about this rumor to Defendants, but they represented that they were not violating the 16V Battery Agreement [*Id.* ¶ 22]. Given Defendants' representations, Plaintiff continued to do business with Defendants [*Id.* ¶ 23]. Plaintiff later learned that Defendants began manufacturing 16-volt batteries that directly competed with the batteries that they were manufacturing for Plaintiff in violation of the 16V Battery Agreement [*Id.* ¶ 24]. Not only were Defendants manufacturing competing 16-volt batteries, but they were also "actually manufacturing and distributing some batteries that were both visually and functionally identical to some of [Plaintiff's] best-selling batteries" ("Copycat Batteries") [*Id.* ¶ 27]. The Copycat Batteries directly compete with Plaintiff's products, they use Plaintiff's tooling, and are

4

virtually identical to Plaintiff's products in terms of their visual appearance (design, texture, and color scheme of the battery enclosures) [*Id.* ¶¶ 28, 29, 32, 33].

According to Plaintiff, Defendants continue to manufacture and distribute the Copycat Batteries and the 16-volt batteries in violation of the 16V Battery Agreement [*Id.* ¶¶ 30, 31]. Given that the Copycat Batteries are virtually identical to Plaintiff's products, it has "caused confusion in the marketplace and/or are likely to cause confusion in the marketplace as to the source, sponsorship, affiliation, and/or association of the Copycat Batteries" [*Id.* ¶ 34]. One of the most distinctive features of Plaintiff's batteries is the design of the battery enclosures [*Id.* ¶ 35].

Plaintiff believes that Defendants have "also adopted many of the same distribution channels and marketing platforms used by [Plaintiff] and is actively distributing the Copycat Batteries in the United States and throughout North America, and potentially even worldwide" [*Id.* ¶ 38]. In addition, Defendants have "falsely and/or misleadingly communicated and conveyed to the public that the Copycat Batteries are preferred and/or superior to [Plaintiff's] products" [*Id.* ¶ 39]. The Counterclaim alleges:

> [Defendants'] unauthorized imitation of [Plaintiff's] unique and proprietary product designs and trade dress, its adoption of the same distribution and marketing channels, its false and/or misleading representations that the Copycat Batteries are preferred and/or superior to [Plaintiff's] batteries, and its other misconduct . . ., were (and are) intentionally calculated to confuse consumers about the source, affiliation, association, and/or sponsorship of the Copycat Batteries and the quality of the Copycat Batteries, and to unlawfully divert sales from [Plaintiff] to Fullriver and/or its affiliates

[*Id.* ¶ 40].[2]

---

[2]    The Court will not summarize the trade secret allegations as Plaintiff does not seek damages for misappropriating trade secrets [*See* Doc. 59 p. 3].

Based on the above, in its Counterclaim, Plaintiff alleges (1) Count I, breach of contract; (2) Count II, trade dress infringement in violation of 15 U.S.C. § 1125(a); (3) Count III, trade dress dilution in violation of 15 U.S.C. § 1125(c); (4) Count IV, unfair competition and/or false designation of origin in violation of 15 U.S.C. § 1125(a); (5) Count V, false advertising in violation of 15 U.S.C. § 1125(a); (6) Count VI, trade dress dilution and injury to business reputation in violation of Tenn. Code Ann. § 47-25-513; (7) Count VII, trade dress infringement under common law; (8) Count VIII, unfair competition; (9) Count IX, conversion; (10) Count X, unjust enrichment/quantum meruit; (11) Count XI, unfair or deceptive trade practices in violation of Tenn. Code Ann. §§ 47-18-101, *et. seq.*; (12) Count XII, misappropriation of trade secrets in violation of Tenn. Code Ann. §§ 47-25-1701, *et seq.*, and/or 18 U.S.C. §§ 1836, *et seq.*; (13) Count XIII, intentional interference with contractual and/or business relationships; and (14) Count XIV, equitable setoff [*Id.* at 23–40].

### B.    Procedural History

As mentioned above, Defendants filed the Complaint in this matter and originally participated in this case.  On April 9, 2020, the parties filed a joint motion to stay the case for 120 days so they could engage in a settlement conference or mediation [Doc. 27].  In addition, the parties noted the unique circumstances of this case, including Defendants' location in China and the COVID-19 pandemic [*Id.*].  On April 13, 2020, the Court granted the request and stayed the case [Doc. 28].  The case remained stayed until June 6, 2022 [Doc. 44].

During the stay, however, defense counsel filed a motion to withdraw, citing "fundamental differences" and "a lack of contact" with Defendants [Doc. 40].  Defense counsel noted that Defendants are solely utilizing their attorneys in China regarding settlement negotiations [*Id.*].  Judge Crytzer granted the motion but explained that because Defendants are corporations, they

6

must be represented by an attorney [Doc. 41]. The Court ordered new counsel for Defendants to enter an appearance by May 13, 2022, or show cause why the Court should not dismiss this action for failing to retain counsel [*Id*.]. Defendants did not respond to the Court's Order.

On May 18, 2022, the Court dismissed Defendants' claims with prejudice pursuant to Rule 41(b) of the Federal Rules of Civil Procedure [Doc. 42]. The Court further ordered Plaintiff to file a notice indicating whether it wanted to pursue its Counterclaim [*Id*.] On May 31, 2022, Plaintiff filed a Notice of Intent to Prosecute Counterclaims [Doc. 43], and upon receiving notice, the Court lifted the stay and entered a Scheduling Order [Doc. 44].

On December 2, 2022, the Court ordered Plaintiff to file a status report relating to its intention to prosecute its Counterclaims against Defendants [Doc. 45]. On December 15, 2022, Plaintiff filed applications for entry of default against Defendants, along with a status report [Docs. 46, 47, 48]. Subsequently, on January 9, 2023, the Court directed the Clerk of Court to enter the default against Defendants [Doc. 50], and the Clerk entered the default the same day [Doc. 51]. On February 10, 2023, the Court entered a show cause order directing Plaintiff to show cause why it should not dismiss its claim for failure to prosecute against Defendants [Doc. 52]. In lieu of responding to the Court's order, the District Judge noted that Plaintiff may move for entry of default judgment [*Id*.].

On February 24, 2023, Plaintiff filed its motion for default judgment [Doc. 53]. The Court held an evidentiary hearing on June 22, 2023 [Doc. 65], and Defendants did not attend. Following the evidentiary hearing, Plaintiff filed its Motion to Voluntarily Dismiss Certain Claims [Doc. 69], its Motion to Recover Attorneys' Fees and Costs [Doc. 74], and its Motion for Permanent Injunction [Doc. 77].

7

## II.    TESTIMONY

During the June 22 hearing, Plaintiff presented the testimony of Scottie Ray Johnson ("Johnson"), Plaintiff's owner and president [Doc. 67 p. 9].  Johnson testified about Defendants' liability and the damages that Plaintiff seeks.  The Court will therefore summarize Johnson's testimony regarding liability and then turn to his testimony about damages.

*Liability.*  According to Johnson, Plaintiff, which does business as "XS Power," is a battery manufacturing company that "design[s] and develop[s] battery products for automotive aftermarket applications" [*Id*.].  Plaintiff designs and developments the batteries in Knoxville, Tennessee, but manufacturers them overseas [*Id*.].  One product that Plaintiff sells is the AGM battery [*Id*. at 52].  An AGM battery is a lead acid battery, which is the conventional battery used in everyday application, such as in cars, boats, and tractors [*Id*.].   Plaintiff's product is a high-performance version of the common variety of AGM batteries [*Id*. at 53].

In 2006, Johnson was hired to develop a battery product [*Id*. at 10].[3]  He spent about a year investigating manufacturer candidates, which is how he was introduced to Defendants [*Id*.].  Johnson traveled to China to meet with Defendants' representatives and later entered into a manufacturing agreement [*Id*.].   Johnson also testified that he takes precautions to protect Plaintiff's product, such as entering into confidentiality agreements [*Id*. at 27; Exh. 14].  Johnson explained that "it's important to have a vendor agreement in general just to protect your intellectual property, so [Plaintiff] has never entered into a vendor relationship without one of these [Ex.14]

---

[3]    Johnson originally worked for Key Components, Inc. d/b/a Powermaster ("Powermaster"), a company in Knoxville [Doc. 67 p. 10; *see also* Exh.14].  When Johnson visited Defendants in China, it was on behalf of Powermaster; however, Plaintiff acquired that company during the parties' relationship, which included all the rights and contracts between Powermaster and Defendants [Doc. 67 p. 13].

8

in place" [Doc. 67 p. 27]. While Exhibit 14 is an unsigned copy, Plaintiff has a copy that is signed by the parties [*Id*. at 28].

During the course of parties' relationship, Plaintiff invested money to design and acquire the necessary tooling needed to manufacture the specific battery enclosures for the XS Power batteries [*Id*. at 17]. The tooling consists of custom-designed and custom-built plastic injection molds and molding equipment [*Id*.]. The smaller molds were approximately $5,000 to $10,000 each, the medium molds were approximately $30,000 to $45,000 each, and the larger molds were "upwards of $50,000" each [*Id*. at 66]. According to Plaintiff, he invested approximately $100,000 for the tooling at issue in the lawsuit [*Id*. at 42].

Johnson testified that the external visual and physical appearances of Plaintiff's products are unique and visually more appealing than competitors [*Id*. at 13 and 14; *see also* Exh. 2]. He stated as follows:

> [W]e've incorporated in the actual steel mold our logo, reinforcement to hold the battery together better, and high-vibration applications. Under Detail 2 [in Exhibit 2], you can see the rather large output terminals that are made from copper which a lot of battery companies were not doing at that time. You can see accommodations on the sides for being able to lift the battery for a handle, and of course our logo and positive and negative markings on the top.

[Doc. 67 p. 13; *see also* Exh. 2]. Johnson further testified that its battery can be "mounted from the bottom[,]" which is "a unique part of [the] design" [Doc. 67 p. 13]. In addition, Plaintiff's product design is made so that customers can attach accessories, and the lid contains a groove "that allows the battery to be used in multiple different applications" [*Id*. at 14]. With respect to Exhibit 2, Johnson explained:

> So for this particular design, if a customer wanted to relocate the terminal, the connection terminal from the top of the battery to the side of the battery, before our development, you would have to buy

9

> a separate battery designed for that altogether, but this innovation
> that I designed that allows customers to buy one battery and an accessory
> item to make that change at a relatively low cost without having to
> buy an entire different battery for the application, so it's very unique
> to us.

[*Id*. at 14; *see also* Exh. 2].  Commenting on the visual appearance, Johnson noted that Plaintiff

embedded the logo into the plastic molding because "stickers or labels don't last forever" and

Plaintiff's "products are designed to last for ten years or more" [Doc. 67 at 15].  With respect to

the color, Johnson testified that "having a white lid helps reflect heat and having a dark-colored

lower case helps retain heat where it's needed in [a] really cold environment" [*Id*.].  Therefore, the

"color is visual but it's also for a purpose" [*Id*.].

In 2009, the parties executed the 16V Battery Agreement [Exh. 15].  Johnson testified that

the 16V Battery is one of Plaintiff's most popular products [Doc. 67 p. 30].  Plaintiff was

"dominant in the 16-volt battery market" and "was the only manufacturer worldwide that offered"

this battery [*Id*. at 30–31].  Plaintiff did not initially give Defendants access to manufacture this

battery because Johnson "wanted to establish a level of trust" [*Id*. at 30].  The 16V Battery

Agreement provides as follows:

> I.    XS Power agrees to accept the risk and pay in full the closed
>        tooling costs required to open the 16V battery tool.
>
> II.   XS Power agrees to purchase a minimum of 3,000 16V
>        [b]atteries from said tool per year.
>
> III.  Fullriver agrees to contact XS Power before development of
>        a new 16V AGM battery model to be used within the
>        performance automotive and car audio markets, and will
>        allow XS Power to review the design and specifications of
>        any new model to protect XS Power's trademarks and
>        features.
>
> IV.   Fullriver agrees to establish a commission for any batteries
>        sold that are produced for the performance automotive and
>        car audio market within the 20 – 100 pounds (9–45kg) range

10

as well as a commission for any batteries produced on the XS Power closed tool.

V.      Fullriver agrees they will not open a 16V model in the range of 20–100 pound (9–45 kg) that will be offered to Fullriver customers in the performance automotive and car audio markets.

VI.     Fullriver agrees they will not open a 16V model in the range of 20–100 pound (9–45 kg) as a closed tool to any Fullriver customer that distributes to the performance automotive and car audio markets without notifying XS Power.

VII.    XS Power agrees to allow 16V AGM batteries to be developed and produced by Fullriver for other markets such as golf carts, floor scrubbers, telecom or any other market that does not interfere with the performance automotive and car audio markets.

[Exh. 16]. Johnson acknowledged that the parties never established the commission pursuant to section IV [Doc. 67 p. 58].[4] Later, in 2011, Plaintiff authorized Defendants to use its registered trademark "XS Power" [*Id.* at 29; Exh. 15]. Johnson explained that the Authorization Letter is required by the government to import products from China to ensure that the products are authentic [Doc. 67 p. 29]. Johnson testified that the parties' "business was very good for many years" [*Id.* at 10].

Johnson went to "great lengths to protect [Plaintiff's] information" explaining that he has experience with Chinese companies stealing intellectual property [*Id.* at 25]. He goes to such great lengths because manufacturers can find customers and offer them cheaper prices given that the products are manufactured at their facilities [*Id.*]. In the 2013 to 2014 timeframe, Johnson received indication from its international customers that Defendants were contacting them [*Id.* at 10, 25–

---

[4]     Plaintiff is not seeking any commission on sales given that there was never an agreement on the actual commission [Doc. 67 p. 58].

26]. Johnson investigated and confronted Defendants about it, and Defendants agreed they made a mistake [*Id*. at 10]. Johnson reminded Defendants that the parties had agreements in place, and Defendants agreed to give Plaintiff a 15% commission on those international sales [*Id*. at 10, 26].

In 2017, Defendants announced their own lineup of batteries, which originally did not include a 16-volt battery [*Id*. at 26]. Shortly thereafter, on February 27, 2017, Plaintiff received an email from its distributor in Trinidad, stating as follows: [5]

> Hello Scottie,
>
> Just wanted to let you know about some problems i have been having over the last few weeks. Recently, full throttle batteries have been introduced to Trinidad and the local distributor for them is causing alot of problems.. He is telling people that full throttle batteries are "made by XS Power" and is convincing customers, some of which are my regular customers, to purchase Full Throttle.
>
> They are also underselling XS power by 20-25% , so i have been losing alot of business because of this. The full throttle battery also looks identical to XS Power, so alot of my regular customers are being persuaded to purchase Full Throttle
>
> Can you provide some guidance?

[Exh. 13; *see also* Doc. 67 p. 26]. Later in 2017, Defendants announced the introduction of their own 16-volt battery [Doc. 67 p. 26; Exh. 17].

Johnson testified that Exhibit 3 is Defendants' version of Plaintiff's most popular 12-volt battery, which is what Defendants offered prior to their Full Throttle Lineup [Doc. 67 p. 16]. Johnson believes the manufacturing of this product (Exhibit 3) "was [Defendants'] first step in . . . testing the waters of how close they [could] get to [his] product without getting [him] upset" [*Id*.]. Johnson pointed out that the battery displayed in Exhibit 3 contains Plaintiff's design elements, including the side terminal, the carrying handle, and the accessory groove [*Id*. at 16–17]. Johnson

---

[5] The Court has not edited this email for typographical errors.

added that Defendants "used [his] exact tool" for the product in Exhibit 3 [*Id*.]. With respect to the accessory groove, Johnson explained that it is how he first became aware that Defendants were copying Plaintiff's battery because the accessory groove was primarily used to visually distinguish Plaintiff's battery from others and its functional purpose was for Plaintiff's aftermarket accessories [*Id*. at 18]. Johnson testified that Exhibit 4 is another one of Defendants' batteries, which shows the design features that they used from Plaintiff's batteries, including reinforcements to prevent the battery from swelling in high heat applications and carry handle attachments [*Id*. at 19 (*compare* Exh. 1 p. 2 *with* Exh. 4)].

Johnson testified that Exhibit 5 is Plaintiff's largest sized battery and that Defendants had offered a similar battery model, called the DC140, prior to the parties' business relationship [Doc. 67 p. 20]. According to Johnson, "The DC140 was designed for deep cycle applications, not for our high-powered applications. [Plaintiff's] product shared the same capacity, but the internal resistance was much lower allowing the burst output power for engine starting and high-powered applications to be superior" [*Id*. at 21]. Plaintiff's version was an improvement from the battery that Defendants offered because it included lid modifications and higher power output [*Id*.]. Plaintiff provided Defendants a copy of its CAD drawings [*see* Exh. 6], and Exhibit 7 shows Plaintiff's finished product of this specific battery [Doc. 67 p. 20]. Johnson testified that Defendants copied this battery [*Id*. at 21]. Johnson explained that Exhibits 8 and 9 show Defendants' attempts to mimic Plaintiff's largest sized battery, and Exhibit 10 is "the final and current product that [Defendants]" offer [*Id*.]. With respect to the battery shown in Exhibit 10, Johnson explained as follows:

> It uses my color housing, it uses my enlarged terminals, it uses my
> – essentially all they've done is they've grinded my logo out of the
> mold, and they've added product labels that have a similar design
> appearance to my product labels. Prior to my involvement with

13

> [Defendants], none of their batteries ever used design labels. They
> just used screen printing with basic specifications.

[*Id*. at 22]. Johnson stated that Defendants used his color differentiation between the lid and the

case, the same location of the terminals, and that Defendants' battery is "an identical replica of

[Plaintiff's] battery" with only the logo removed [*Id*.]. Johnson testified that Exhibit 11 shows the

similarity of Defendants' batteries to Plaintiff's batteries, stating that Defendants "got as close as

they thought they could get to [his] color scheme so that they could purposely create confusion in

the market and capture some of [Plaintiff's] sales" [*Id*. at 15 and 23; Exh. 11]. Johnson further

testified that Exhibit 12 is a sample of products that compete with Plaintiff's products [Doc. 67 pp.

23–24; Exh. 12]. Johnson stated:

> [O]ne of the reasons we chose the color scheme was not only
> utilitarian, but it was also to make our products stand apart from
> everything else in the battery market based on the color of the label.
> So the general scheme of the product remained the same where it
> has the gray bottom and the white lid, and the label would change
> based on which market we sell to and since we've expanded that,
> but their product came along, and the design of their label and the
> color scheme matched ours very closely as if the design work was
> done by the same designer.

[Doc. 67 p. 24].

*Damages.* Johnson testified that Plaintiff was damaged by Defendants' actions, including

lost sales, having to find a new manufacturer, and loss of its tooling, which Defendants kept [Doc.

67 pp. 32, 40, 42]. With respect to lost sales, Johnson testified that there are two calculations: lost

sales from the introduction of the Full Throttle line from 2017 to 2019 and Plaintiff's lost revenue

from July 2019 to June 2023 [Doc. 67 pp. 33, 38; *see also* Doc. 71 p. 20]. Johnson testified that

85% of Plaintiff's revenue from 2016 to 2020 was from the AGM battery [Doc. 67 p. 53]. The

approximate revenue for each year from 2016 through 2018 was about $6 million, and in 2020,

Plaintiff's revenue was about $10 million [*Id*.]. When Defendants introduced the Full Throttle

14

line, Plaintiff did not see an overall loss in revenue because it was "able to work with [its] customers to sell other products . . . and [it was] able to presale some of [its] upcoming new items based on the new specifications and changed information" [*Id*. at 53–54]. Johnson stated, however, that during this period, Plaintiff was "not able to grow the company like [it] ordinarily would have been able to" [*Id*. at 54].

Johnson testified that Exhibit 23 shows Plaintiff's sales history for three of its customers that were targeted by Defendants [*Id*. at 32]. Lesco and Sky High told Plaintiff that they were no longer interested in Plaintiff's products given Defendants' cheaper production, calling it a "business decision" [*Id*. at 33]. With respect to Amazon, Johnson explained that there is not a representative that Plaintiff could contact about the issues [*Id*.]. Johnson pulled Plaintiff's products from Amazon, stating:

> We did that because [Defendants] were going directly to market using their customers and themselves directly, and in their listings they would list our product numbers, and they would say that this Fullriver battery model is a replacement for XS Power equivalent battery model. So they were using our—they were using the many years of search optimization that we created online with our brand to make it so that any time someone searched for our product on Amazon, their product would come up first and it would be cheaper than our product. So in an effort to minimize the damage from that, we opted out of Amazon altogether, in the date I showed there [Exhibit 23]. I think it was 2020.

[*Id*. at 58–59]. Johnson noted that Exhibit 23 is only a representative sample of business that Plaintiff lost, but those companies are distributors that "have a long list of retail customers that they sell to that are all affected" [*Id*. at 74]. Johnson stated that he reviewed Defendants' distributor list on their website, and that they have at least 150 different distributors that Plaintiff attempted to sell to, but they declined [*Id*. at 76].

Johnson testified that after the parties' relationship ended, Plaintiff's sales on its lead battery improved because it "found ways to improve the quality of [the] product . . . but the question remains what could we be selling if they were not copying the trade dress and still sharing the same story that they have some association with us" [*Id*. at 60]. Johnson estimated that Plaintiff lost $5 million from 2017 to July 2019 based "on trends that [he has] seen in sales overall and lost relationships with distributions and sellers that [he] had previously" [*Id*. at 34]. In addition, Johnson explained that his $5 million estimate is based on his assumption that Plaintiff was not acquiring the market share that it could have acquired because Defendants "acquired customers that [Plaintiff] cannot get now because they sell significantly cheaper than [Plaintiff], and they're advertising it as the same thing" [*Id*. at 60].

With respect to the other calculation of lost profits from July 2019 to June 2023, Johnson created a "Container Summary" [Doc. 67 p. 60; Exh. 24].[6] Johnson explained as follows:

> I go to great lengths to mask my import records, but Fullriver does not do that. So I can use tools to pull the number of containers that they export to all customers every year, so it's something I keep an eye on just to gauge the size of my competitors.
>
> And one thing that I've, that you can tell from this, this summary is derived from some raw data of import records. And what I've done is taken that raw data and excluded business between Fullriver China to any other domestic customer or international customer and limited it only to business that has shipped between Fullriver China and Fullriver North America, and this is the container count each year, that, that has, that I've come up with. And because of my history doing business with Fullriver, I know that my average container cost to import from them was somewhere around $80,000 per container. And for simplicity sake, I just left it even even though I know that material costs have increased over the years, but I didn't want to create confusion in that demonstration.

---

[6]     Johnson used the data in Exhibits 25 and 26 to develop the summary contained in Exhibit 24 [Doc. 67 p. 60]. Exhibits 25 and 26 contain the data from import records, which are government records [*Id*. at 37]. Exhibit 25 is a condensed version of the data from the import records, while Exhibit 26 is the raw data [*Id*. at 37–38].

16

So that gives us a total value of the containers that they've brought in, and based on the price that they sell at currently with their online listings and through their distribution channels, I know that their gross margin is roughly 45 precent, so this allows me to derive the revenue generated by Fullriver North America or to Fullriver China year over year.

So you can see clearly in 2018 as they started to ramp up their imports, they significantly increased the volume of containers they were bringing in that year to be able to stage against us. In 2019, you can see there was a dip there. I attribute that to the tariffs that were imposed at that time. The battery products fell into the 25 precent Trump tariff category, so a lot of Chinse manufacturers backed off of their ordering, but you can see it ramps right back up again in just last year. They increased a significant amount to bring more and more products in to compete against us, and these revenue numbers are just, again, they're just representative of the revenue between the Chinese company and the North America company.

[Doc. 67 pp. 35–36]. Johnson stated that he knows "for a fact" that the containers hold lead acid battery products [*Id*. at 37–38]. The raw data, Johnson testified, contains the contents of the container and the weight of the container, so Johnson "excluded anything that was not an AGM battery" [*Id*. at 37]. While it is difficult to estimate the percentage of containers that contained the Copycat Batteries, Johnson estimated that 15% of the total revenue constituted Copycat Batteries, or approximately $5,000,000 [*Id*. at 61 and 62]. Based on these assumptions, Johnson estimated that Plaintiff's total of loss sales from 2017 to 2023 was $10 million [*Id*. at 38].

With respect to out-of-pocket damages, Johnson stated that Plaintiff had to re-develop the tooling necessary to continue to manufacture the batteries, which cost Plaintiff approximately $250,000 [*Id*. at 66]. In arriving at his $250,000 amount, Johnson explained:

So looking at Exhibit 1, you can see that there are 20 roughly battery models shown there. Each one of those battery models had to be developed from the ground up, and some of these are close replications to what we used to import from Fullriver; but in that case with Fullriver, a lot of those battery products were considered off-the-shelf offerings, so many of the smaller battery models that

17

> were less popular, we were able to have them manufacture the internals to meet our specifications, but the plastic injection model was theirs and we just got to use it. It was part of our manufacturing arrangement, but when we moved, we were able not to have that luxury, so almost every single model had to be–there had to be a new plastic injection tool made, and that's that mini-ton heavy steel tooling that has to be machined and milled and it takes months to make.

[*Id*. at 65]. Johnson stated that the smaller models cost $5,000 to $10,000 each, the medium models cost $30,000 to $45,000 each, and the larger models are "pushing upwards of $50,000" [*Id*. at 66]. Johnson stated his estimate of $250,000 is conservative because "it only reflects actual cash spent with the vendor" and does not reflect the two-year developmental process [*Id*.].

In addition, according to Johnson, Defendants kept Plaintiff's tooling, which cost Plaintiff approximately $100,000 to develop [*Id*. at 67]. Johnson explained that the total tooling costs for the 16-volt battery was about $35,000, the 12-volt battery was also about $35,000, and then Plaintiff had to pay for the other modifications [*Id*.]. Plaintiff requested that Defendants return the tooling, but they did not respond [*Id*.].

## III.    ANALYSIS

The Court has considered Plaintiff's motions and the evidence presented at the hearing. For the reasons stated below, the Court **RECOMMENDS** that the District Judge **GRANT IN PART AND DENY IN PART** Plaintiff's Motion for Entry of Default Judgment [**Doc. 53**], **GRANT** Plaintiff's Motion to Voluntarily Dismiss Certain Claims [**Doc. 69**], **GRANT** Plaintiff's Motion to Recover Attorneys' Fees and Costs [**Doc. 74**], and **GRANT IN PART AND DENY IN PART** Plaintiff's Motion for Permanent Injunction [**Doc. 77**].

After first addressing Plaintiff's request to dismiss certain claims, the Court will discuss the standard with respect to default judgments pursuant to Rule 55 and then turn to Plaintiff's requested damages.

18

## A. Dismissal of Certain Claims

As an initial matter, Plaintiff filed a Motion to Voluntarily Dismiss Certain Claims [Doc. 69], seeking to dismiss without prejudice the following counts:[7] (1) Count XII, misappropriation of trade secrets, (2) Count XIII, intentional interference with business relationships, (3) Count VI, trade dress dilution and injury to business reputation under Tennessee Code Annotated § 47-25-513, (4) Count X, unjust enrichment, and (5) Count XIV, equitable setoff. Plaintiff seeks to dismiss these claims pursuant to Rule 41(c), which provides, "This rule applies to a dismissal of any counterclaim, crossclaim, or third-party claim." Fed. R. Civ. P. 41(c). "Sixth Circuit precedent holds that Rule 41 can only be used to dismiss entire *actions;* accordingly, it cannot be used to dismiss fewer than all parties or all claims." *First Energy Corp. v. Pircio*, No. 1:20-CV-1966, 2021 WL 4256150, at *1 (N.D. Ohio Feb. 16, 2021) (citing *Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961)). Instead, courts within the Sixth Circuit apply Rule 21 "[t]o dismiss fewer than all claims or parties from an action[.]" *Id.* (applying Rule 21 to the defendant's request to dismiss its counterclaim). Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against any party." Fed. R. Civ. P. 21. In light of Plaintiff's representation that it no longer desires to pursue these claims, and Defendants have not responded, the Court recommends that the District Judge **GRANT** this motion [**Doc. 69**] and **DISMISS** these claims without prejudice under Rule 21. The Court will now turn to the remaining claims.

## B. Rule 55

"When a party against whom a judgment for affirmative relief is sought has failed to plead

---

[7]     The counts are listed in the order they are discussed in Plaintiff's motion [Doc. 69].

or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Following the entry of default, a party may apply for default judgment, and the Court may conduct a hearing—if needed, to perform an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter—prior to entering default judgment. Fed. R. Civ. P. 55(b). "Once the Clerk has entered a default against a defendant, the Court must treat all well-pleaded allegations in the Complaint as true." *AF Holdings LLC v. Bossard*, 976 F. Supp. 2d 927, 929 (W.D. Mich. 2013) (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (entry of default judgment "conclusively establishes every factual predicate of a claim for relief")).

In the present matter, the Clerk entered a default against Defendants on January 9, 2023 [Doc. 51]. On April 6, 2023, the Court entered a Show Cause Order [Doc. 55], directing Defendants to appear in Court on May 18, 2023, to show cause why a default judgment should not be entered. At Plaintiff's request, the Court continued this hearing to June 22, 2023 [Doc. 62]. Defendants did not appear at the hearing.

Based on the entry of default, Plaintiff seeks a determination of liability on the following claims: (1) Count I, breach of contract; (2) Count II, trade dress infringement in violation of 15 U.S.C. § 1125(a); (3) Count III, trade dress dilution in violation of 15 U.S.C. § 1125(c);[8] (4) Count

---

[8] In order to sufficiently allege a trade dress dilution claim in violation of 15 U.S.C. § 1125(c), a plaintiff must plead: "1) its trade dress is distinctive; 2) its trade dress is non-functional; 3) its trade dress is famous; 4) [the defendant] is using the trade dress in commerce; 5) [the defendant] began such use after the trade dress became famous; and 6) [the defendant's] use dilutes the distinctive quality of the trade dress." *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 700, 716 (N.D. Ohio 1999). While several of these elements overlap with Plaintiff's trade dress infringement claim, it is unclear to the Court whether it intends to pursue this cause of action. The Court notes that in Plaintiff's Motion to Voluntarily Dismiss Certain Claims [Doc. 69], it requests that the Court dismiss the trade dress dilution claim under state law (Count VI), claiming that it is unable to develop the evidence on this claim. Moreover, in its Post Hearing Brief, Plaintiff sets forth its Lanham Act violations but omits its federal trade dress dilution claim [Doc. 71 p. 2].

IV, unfair competition and/or false designation of origin in violation of 15 U.S.C. § 1125(a); (5) Count V, false advertising in violation of 15 U.S.C. § 1125(a); (6) Count VII, trade dress infringement under common law; (7) Count VIII, unfair competition; (8) Count IX, conversion; and (9) Count XI, unfair or deceptive trade practices in violation of Tennessee Code Annotated § 47-18-101, *et. seq*.

***Breach of Contract Claim.*** In order to sufficiently allege a breach of contract claim in Tennessee, the plaintiff must allege "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC–Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). Here, Plaintiff alleges that the parties entered into the 16V Battery Agreement, wherein Defendants agreed not to manufacture the 16-volt batteries in direct competition with Plaintiff, they agreed not to use Plaintiff's tooling for any other products, and that they did so without Plaintiff's permission [Doc. 15 ¶¶ 10–14, 21–31, 51–55]. In light of this breach, Plaintiff alleges "actual damages in the form of lost revenues, lost profits, and loss of market share" [*Id*. ¶ 56]. Based on these well-pleaded allegations, the Court recommends that Defendants be found liable for breaching the 16V Battery Agreement.

***Lanham Act and Common Law Claims.***[9] "The Lanham Act, 15 U.S.C. § 1051 *et seq.*, is

Thus, it appears to the Court that Plaintiff has abandoned this claim. To the extent it has not abandoned this claim, the Court recommends that Defendants not be found liable for trade dress dilution as the Counterclaim does not sufficiently plead that Plaintiff's trade dress is famous [*See* Doc. 15 ¶¶ 73–78]. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 241 (S.D. N.Y. 2012) (discussing "famous" under the Lanham Act).

[9] The Tennessee unfair competition claims and common law infringement claims are analyzed under the same standards as federal claims. *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 624 F. Supp. 2d 883, 891 (W.D. Tenn. 2008) (citation omitted), *aff'd*, 617 F.3d 402 (6th Cir. 2010).

a federal statute that primarily addresses trademark rights, but it also prohibits unfair competition through the use of misrepresentations of fact about one's own or another's goods, services, or business activities." *Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 745 (M.D. Tenn. 2015) (citation omitted). With respect to its claim for trade dress infringement in violation of 15 U.S.C. § 1125(a), the plaintiff must allege "1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 629 (6th Cir. 2002). In support of its trade dress infringement, Plaintiff alleges that the design of its "batteries and their overall visual appearance are unique and distinctive in the marketplace" and that this "distinctive appearance indicates [Plaintiff] as the source of [its] products, and [its] trade dress is unique and entitled to protection under the Lanham Act" [Doc. 15 ¶ 59; *see also* ¶¶ 15–16]. Further, Plaintiff alleges its trade dress includes non-functional designs, such as the "shape and color scheme of the battery enclosures and the textured surfaces on the exterior of the battery enclosures" [*Id*. ¶ 60]. In addition, it "extensively and continuously promoted and used its trade dress in the United States and worldwide" and "[t]hrough its extensive and continuous use, and its extensive sales, advertising, and promotion of its products, [Plaintiff's] trade dress has become a well-known indicator of the origin and quality of [its] battery products" [*Id*. ¶¶ 61–62; *see also* ¶¶ 18–20]. Plaintiff also details how Defendants' products are "confusingly similar" and how customers are purchasing Defendants' products based on an "erroneous belief" that they are Plaintiff's products [*Id*. ¶¶ 66–70; *see also* ¶¶ 32–40]. Based on these well-pleaded allegations, the Court recommends that the District Judge find Defendants liable for trade dress infringement.

To prevail on a claim for unfair competition, the plaintiff must establish that: "(1) the defendant has made a false or misleading statement of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the statement was introduced into interstate commerce; and (5) there is some causal link between the challenged statement and harm to the plaintiff." *Melea Ltd. v. Quality Models Ltd.*, 345 F. Supp. 2d 743, 759–60 (E.D. Mich. 2004). In addition, a plaintiff alleging a false designation of origin claim, must show that the false designation had a "substantial effect on interstate commerce" and that it created a "likelihood of confusion." *Off. Pillowtex LLC v. Hollander Home Fashions Corp.*, 479 F. Supp. 2d 744, 749 (S.D. Ohio 2007) (citation omitted). Here, the Counterclaim alleges:

> [Defendants'] advertisements, promotion, distribution and sale of the Copycat Batteries using [Plaintiff's] unique and proprietary trade dress and product designs: (A) constitutes the use of false designations of origin and tends to falsely represent or designate the source of Fullriver's products as being affiliated with, connected with, or otherwise associated with SPS and tends to falsely represent or characterize Fullriver's products as originating with, sponsored or approved by, or otherwise connected with SPS, when in fact the Copycat Batteries are neither connected with nor authorized, approved, or sponsored by [Plaintiff]; and (B) are likely to cause confusion or mistake in the marketplace or to deceive the purchasing public as to the origin, sponsorship, association, affiliation, or approval of Fullriver's Copycat Batteries.

[*Id.* ¶ 80].

The Counterclaim also alleges that Defendants used Plaintiff's "unique and proprietary trade dress and product designs[]" and that their "products misrepresent and falsely portray to the public the[ir] origin and source . . . and create[] a likelihood of confusion in the marketplace and to purchasers[.]" [*Id.* ¶ 81]. According to the allegations, Defendants have continued to manufacture and distribute the 16-volt batteries in the United States and other international markets, causing $5,000,000

23

in damages [*Id.* ¶¶ 30, 85]. Based on these well-pleaded allegations, the Court recommends that the District Judge find Defendants liable for unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

And finally, a plaintiff alleging a false advertising claim under the Lanham Act must establish:

> (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.,* 270 F.3d 298, 323 (6th Cir. 2001) (citing *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 613 (6th Cir. 1999)). Plaintiff alleges that Defendants made statements in "advertisements, communications, and/or announcements to distributors, customers, others in the industry, and to the public [that] falsely represent[ed] or misleadingly convey[ed] that [their] products are preferred and/or superior to [Plaintiff's] products" [Doc. 15 ¶ 88]. Plaintiff contends that such statements are false and misleading because Defendants' batteries "are made on the same tooling, by the same manufacturer (Fullriver), and us[e] the same designs and trade dress which is distinctive and proprietary to [Plaintiff]" [*Id.* ¶ 89]. Such statements, Plaintiff states, deceives or tends to deceive the audience and are material because they influence customers' purchasing decisions [*Id.* ¶¶ 90–91]. Claiming that the Defendants placed these statements into interstate commerce, Plaintiff avers that such conduct has caused it $5,000,000 in damages [*Id.* ¶¶ 92, 96]. Based on these well-pleaded allegations, the Court recommends that the District Judge find Defendants liable for false advertising under the Lanham Act.

24

***Conversion.***   In Tennessee, in order to plead a claim for conversion, the plaintiff must allege: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights."   *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).   Plaintiff pleaded that Defendants converted its tooling, proprietary battery designs, and trade dress and that Defendants have wrongfully retained possession of this property, despite Plaintiff's demands to cease doing so [Doc. 15 ¶¶ 111–12].   Plaintiff contends that it "is entitled to be restored to exclusive use and possession of the tooling and of its proprietary battery designs and trade dress" [*Id.* ¶ 114].   Plaintiff seeks $5,000,000 for this wrongful conduct and punitive damages [*Id.* ¶¶ 115–16].   Based on these well-pleaded allegations, the Court recommends that the District Judge find Defendants liable for conversion.

***Tennesse Consumer Protection Act Claim.***   In order to state a claim of relief under the Tennessee Consumer Protection Act ("TCPA"), the plaintiff must allege: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated[.]'"   *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47–18–109(a)(1)).

Here, Plaintiff alleges that Defendants "affirmatively passed off (or attempted to pass off) the Copycat Batteries as being manufactured by or otherwise endorsed or affiliated with [Plaintiff]" [Doc. 15 ¶ 123].   In light of Defendants' actions of deliberately causing this confusion, Plaintiff avers that "a potential purchaser might be persuaded that the Copycat Batteries are in fact manufactured or otherwise endorsed by or affiliated with [Plaintiff]" [*Id.* ¶ 124].   According to Plaintiff, Defendants have "also represented that the Copycat Batteries have characteristics or

benefits that they do not have[,]" including representing that they are "superior to [Plaintiff's] batteries, when in fact they are made by the same manufacturer ("Fullriver") using the same tooling and/or designs and design elements[.]" [*Id*. ¶ 125]. Plaintiff further claims:

> In marketing the Copycat Batteries, Fullriver has also used statements or illustrations which create a false impression of the grade, quality, usability and/or origin of the Copycat Batteries, or which otherwise misrepresent the Copycat Batteries in such a manner that there is a likelihood that a buyer may be switched from [Plaintiff's] batteries to the Copycat Batteries[.]

[*Id*. ¶ 128]. Plaintiff contends that it lost money and property as a result of Defendants' actions. [*Id*. ¶ 133]. Based on these well-pleaded allegations, the Court recommends that the District Judge find Defendants liable for violating the TCPA.

In light of the above analysis, the Court **INCORPORATES BY REFERENCE** the well-pleaded allegations set forth by Plaintiff against Defendants in the Counterclaim [Doc. 15]. The Court accepts all such allegations, and specifically, the Court **RECOMMENDS**, based upon entry of default, Defendants are liable for (1) breach of contract, (2) trade dress infringement in violation of 15 U.S.C. § 1125(a) and common law, (3) unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a) and common law, (4) false advertising in violation of 15 U.S.C. § 1125(a), (5) conversion of Plaintiff's property, and for (6) violating the TCPA.

The Court will now turn to the damages that Plaintiff seeks.

## C.    Damages

In its Post Hearing Brief, Plaintiff seeks a total compensatory damages award of at least $27,626,071, plus prejudgment interest, punitive damages, attorney's fees, and injunctive relief. As an initial matter, Plaintiff acknowledges his "evidentiary dilemma presented by the fact [it] does not have any of Fullriver's data" [Doc. 71 p. 21]. In light of this dilemma, Plaintiff states that it had "no choice but to rely upon indirect and inferential proof, including estimations and

26

extrapolations backed by Mr. Johnson's educated assumptions regarding certain matters" [*Id.*].
Primarily relying on *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 253 (1946), Plaintiff states
that "uncertainty resulting from [Defendants'] wrongful actions should not obstruct a rightful
claim for recovery" [Doc. 71 p. 22].

In *Bigelow*, the parties were competing movie theater owners, and the plaintiff's evidence
showed that defendants violated anti-trust laws by conspiring with distributors to play films before
the plaintiff and at a lower price. *Bigelow*, 327 U.S. at 253–54. During the trial, the plaintiff
introduced evidence of the parties' profits and by comparing receipts for similar films. *Id.* at 258–
59. "The sole question before [the Supreme Court was] whether the evidence of damages [was]
sufficient to support the verdict." *Id.* at 253. The Court sustained the verdict, noting "that in
absence of more precise proof, the jury could conclude as a matter of just and reasonable inference
from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and
from the evidence in the decline in prices, profits, and values, not shown to be attributable to other
causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Id.* at 264. The Court
concluded:

> In such a case, even where the defendant by his own wrong has
> prevented a more precise computation, the jury may not render a
> verdict based on speculation or guesswork. But the jury may make
> a just and reasonable estimate of the damage based on relevant data,
> and render its verdict accordingly. In such circumstances "juries are
> allowed to act on probable and inferential as well as (upon) direct
> and positive proof." Any other rule would enable the wrongdoer to
> profit by his wrongdoing at the expense of his victim. It would be
> an inducement to make wrongdoing so effective and complete in
> every case as to preclude any recovery, by rendering the measure of
> damages uncertain.

*Id.* (citation omitted).

While the Court sympathizes with Plaintiff's "evidentiary dilemma" [Doc. 71 p. 21], the "general rule" is that "damages are not permitted which are remote and speculative in nature." *Broan Mfg. Co. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1237 (6th Cir. 1991) (quoting *Agricultural Servs. Ass'n v. Ferry–Morse Seed Co.,* 551 F.2d 1057, 1072 (6th Cir. 1977)). This general rule only precludes recovery "where the *fact* of damages is uncertain, i.e., where the damage claimed is not the certain result of the wrong, not where the *amount* of damages alone is uncertain." *Id*. (quoting *Grantham and Mann, Inc. v. American Safety Prods.,* 831 F.2d 596, 601–02 (6th Cir. 1987)). But "once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Id*. (quoting *Grantham and Mann, Inc.*, 831 F.2d at 602); *see also Vesligaj v. Peterson*, 331 F. App'x 351, 355 (6th Cir. 2009) ("[T]he allegations in the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." (quoting *Credit Lyonnais Sc. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999))).

With this standard in mind, the Court will now turn to the requested relief.

### 1. Conversion

Plaintiff states that Defendants are still in possession of its tooling despite Johnson's demands to return it [Doc. 71 p. 23 (citing Doc. 67 p. 67)]. Stating that there are two different methods to assess damages for conversion, Plaintiff requests that the Court award it the replacement costs, or $250,000.

"The ordinary measure of damages for conversion is the value of the property converted at the time and place of conversion, with interest." *Lance Prods., Inc. v. Com. Union Bank*, 764

28

S.W.2d 207, 213 (Tenn. Ct. App. 1988) (citation omitted). But "if special damages are pleaded and proved, plaintiff may recover for all injuries or losses sustained as a proximate result of the conversion, but there can be no recovery for losses or injuries which are too remote or uncertain." *Id.*[10]

Johnson testified that he spent approximately $100,000 for the tooling Defendants used in their facility [Doc. 67 p. 42]. After the parties' relationship ended, Johnson stated that it cost approximately $250,000 to find a new manufacturer and install the new tooling. As mentioned above, Plaintiff requests that replacement costs be awarded. Based on Johnson's unrebutted testimony, the Court **RECOMMENDS** Plaintiff be awarded $250,000 for Defendants' conversion of its tooling.

### 2. Breach of Contract

Plaintiff submits that Defendants clearly "breached the 16V Battery agreement when [they] began making and selling a 16V battery under the Full Throttle label" [Doc. 71 p. 24]. It acknowledges, however, that Johnson estimated the volume of lost sales based on Defendants' misconduct as a whole. Plaintiff states, "[Johnson] has no reliable information that would allow him [to] estimate (to any reasonable degree of confidence) what proportion of [Plaintiff's] lost

---

[10]    As the Tennessee Court of Appeals explained, "Special damages are 'those damages which are the natural but not necessary result of the wrong.'" *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 383 (Tenn. Ct. App. 2006) (citation omitted). It does not appear that Plaintiff pleaded special damages in the Counterclaim [*See* Doc. 15]. Nevertheless, Tennessee pleading standards do "not govern pleading standards in federal court[]" and "Sixth Circuit case law does not recognize stringent pleading standards." *Ladd v. Nashville Booting, LLC*, No. 3:20-CV-00626, 2021 WL 3363448, at *12 (M.D. Tenn. Aug. 3, 2021). As the Middle District of Tennessee explained, "Sixth Circuit case law strongly suggests that allegations of damages can be quite general." *Id.* (citation omitted).

sales is attributable directly to the introduction of the prohibited 16V battery" [*Id*. at 25]. Noting that "there is substantial (if not total) overlap between [Plaintiff's] contract damages and the damages it suffered as a result of [Defendants'] Lanham Act and TCPA violations[,]" Plaintiff submits that the Court may assess damages globally [*Id*.].

In light of Plaintiff's representation, the Court will proceed with analyzing the damages pursuant to the Lanham Act and the TCPA.

### 3. Lanham Act, common law, and the TCPA

Plaintiff contends that it has "suffered significant losses as a direct and proximate result of [Defendants'] misappropriation and mimicking of [its] distinctive trade dress" so much so that it has created market confusion [*Id*. at 25–26]. Plaintiff seeks $10 million in damages for Defendants' misconduct, plus treble tremble damages under the TCPA.

Under the Lanham Act, Plaintiff is entitled to recover, "subject to the principles of equity, . . . (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117. In addition, under the TCPA, the plaintiff is entitled to actual damages, and the court may award treble damages. Tenn. Code Ann. § 47-18-109(a).

Here, Plaintiff seeks $10 million in lost profits from 2017 to 2023, stating that "Johnson's methods and assumptions seemed both reasonable and fair, and the underlying data he used to arrive at his estimate appeared to be reliable and credible data" [Doc. 71 p. 19]. Of the $10 million Plaintiff seeks, $5 million is for lost sales between 2017 through July 2019, and the other $5 million is lost sales from July 2019 through June 2023 [*Id*. at 20]. With respect to lost sales from 2017

through July 2019, Johnson arrived at this estimate, in part, by reviewing Plaintiff's "market share in the high-performance AGM Market segment, as well as [Plaintiff's] inability to make any inroads with at least 150 distributors whom he believes (based on information he gleaned from the Full Throttle website) are doing business with Fullriver, but will not do business with [Plaintiff] because they were persuaded by Fullriver's false marketing tactics" [*Id*. at 19]. Johnson believes that all of Plaintiff's declining market share was related to Defendants' introduction of the Full Throttle batteries, including the Full Throttle 16V battery" [*Id*.]. Johnson explained that his calculation of damages is based on an "extrapolation of sales that [Plaintiff] would have acquired in terms of growth" had Plaintiff's sales continued to trend, in addition to his "assumption" that "80 to 85% of [Plaintiff's] gross revenue was from AGM batteries" [Doc. 67 p. 56].

"A plaintiff need only show that its damages calculation is a 'fair and reasonable approximation' of its lost profits." *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 428 (S.D. N.Y. 2013) (quoting *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 305 (S.D. N.Y. 2002)). But here, Johnson did not offer sufficient testimony regarding Plaintiff's lost profits from 2017 through July 2019. To be sure, Johnson offered a representative sample of the customers he lost: Amazon, Lesco, and Sky High [Exh. 23; *see also* Doc. 67 p. 32 ("So this is a representative of the sales history of a few of our customers that were targeted, the ones that came to mind."). And as Johnson testified, sales with these distributors decreased after Defendants introduced the Full Throttle Line in 2017 [Exh. 23]. But Johnson did not offer sufficient testimony or any relevant data on future projections, even with respect to these distributors. Johnson generally discussed sales trends and overall sales but provided no details on the actual sales trends and overall sales. For example, Johnson testified that from 2016 to 2020, about 85% of Plaintiff's revenue was from the AGM batteries, and today it is 65% [Doc. 67 p. 53]. He stated that Plaintiff's

revenue from 2016 to 2018 was in the "$6 million . . . range" and that in 2020 it was "more like $10 million" [*Id.*]. But with the missing gaps in years and the dollar amounts only being in the "ranges," the Court cannot make a reasonable inference that Plaintiff's damages were $5 million. In fact, it is unclear to the Court how Johnson reached his opinion that damages were $5 million from 2017 through July 2019.

Further, Johnson testified that there are at least 150 distributors on Defendants' website to whom Plaintiff cannot now sell its products [Doc. 67 pp. 75–76]. But there was no evidence about the price of Plaintiff's products, the costs to produce, and its anticipated profit from these distributors. Without the relevant data, Johnson's assumptions render Plaintiff's damages calculation speculative. *Cf. Abbott Laboratories v. Adelphia Supply USA*, No. 17-CV-6002, 2019 WL 5696148, at *46 (E.D. N.Y. Sept. 27, 2019) ("Lost profits are calculated by estimating the revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue." (quoting *Victoria Cruises v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D. N.Y. 2008)); *see Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *14 (E.D. N.C. May 4, 2005) (finding the damages model insufficient because it "includes several assumptions that do not reflect the circumstances of the case"), *aff'd*, 182 F. App'x 267 (4th Cir. 2006).

Similarly, Plaintiff's calculation of lost profits from July 2019 to June 2023 is also in the realm of speculation. In order to obtain his estimation, Johnson created a Container Summary [Exh. 24], which lists the number of containers Defendants imported from 2016 to 2023 [Doc. 67 pp. 35–35; Exh. 24]. Using Plaintiff's average container costs of $80,000, and his personal knowledge that Defendants' gross margin "is roughly 45 percent[,]" he was able to arrive at the revenue for each year [Doc. 67 pp. 35–36; Exh. 24]. Based on the raw data [*see* Exh. 25 and 26],

Johnson determined that the containers held lead acid battery products, stating that the contents of the containers are reflected on the import records [Doc. 67 pp. 37–38]. And while it is difficult to estimate the percentage of containers with the Copycat Batteries, Johnson provided a conservative estimate of 15% of the total revenue, which is based on knowing Defendants' customer base [Doc. 67 p. 61].

But Johnson did not offer sufficient testimony on Defendants' customer base (or Plaintiff's former or current customer base), making it difficult for the Court to conclude that there is substantial evidence to draw a reasonable inference that $5 million is appropriate under these circumstances. *Broan Mfg. Co.*, 923 F.2d 1237 (explaining that an award of damages requires substantial evidence to permit the court to "draw reasonable inferences and make a fair and reasonable assessment of the amount of damages" (citation omitted)); *Elec. Workers Loc. 369 Benefit Fund v. Churchman Elec. & Techs., LLC*, No. 319CV00652DJHCHL, 2022 WL 989732, at *5 (W.D. Ky. Jan. 19, 2022) ("The undersigned is not unsympathetic toward Plaintiffs' difficulties proving damages against uncooperative Defendants, but given the requirements of Rule 55(b)(2), the undersigned finds that the appropriate relief is an award of $0 for actual damages"), *report and recommendation adopted*, No. 3:19-CV-652-DJH-CHL, 2022 WL 2405366 (W.D. Ky. Mar. 4, 2022). Accordingly, the Court finds that Johnson's testimony is too speculative, and the undersigned declines to recommend that it be awarded $10 million.

### 4. Injunctive Relief

Following the damages hearing, Plaintiff filed its Motion for Permanent Injunction [Doc. 77], which seeks injunctive relief pursuant to the Lanham Act, common law, and the TCPA. Citing to Rule 65, Plaintiff states that it is entitled to an injunction and has filed a proposed injunction for the Court's consideration [*See* Doc. 77-1 pp. 1–4].

33

Title 15, section 1116 provides that the Court may enter an injunction, "according to principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation under" the Lanham Act.  15 U.S.C. § 1116.  "A plaintiff seeking any such injunction shall be entitled to rebuttable presumption of irreparable harm upon a finding of a violation . . ." of the Lanham Act.  *Id*.  In addition, pursuant to TCPA, a person may bring an action to "enjoin the person who has violated, is violating, or who is otherwise likely to violate this part."  Tenn. Code. Ann. § 47-18-109(b).   Rule 65 allows the Court to enter an injunction but requires that the order "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." Fed. R. Civ. P. 65(d).  In order to establish that an injunction is appropriate, the plaintiff must establish that (1) it has suffered an irreparable injury, (2) the remedies at law are insufficient to compensate for the injury, (3) when balancing the hardships between the plaintiff and the defendant, a remedy in equity is warranted, and (4) the public interest would be served by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *Versah, LLC v. UL Amin Indus.*, No. 220CV12657TGBRSW, 2021 WL 3885865, at *7 (E.D. Mich. Aug. 31, 2021) (citations omitted).

After considering the above authority, along with the four factors, the Court finds an injunction appropriate in this case. First, as Johnson testified, Defendants infringement has continued and has resulted in customer confusion. *Versah, LLC*, 2021 WL 3885865, at *7 (finding that the first factor weighed in favor of an injunction because the "[d]efendants' infringement is likely to result in confusion and loss of customer goodwill if [d]efendants continue to utilize [p]laintiffs' copyrighted and trademark-protected materials").  The Court finds that the second element is present given that Defendants have failed to participate in this proceeding.  *See id*.

34

("Here, an award of money damages would be inadequate as Defendants' failure to participate in these proceedings has prevented Plaintiffs from conducting discovery to determine the extent of damages it could recover."). "Additionally, harm to reputation and consumer confusion are injuries which are difficult to compensate with monetary damages." *Id*.

Third, Defendants can claim no hardship because "any hardship experience by [them] is merely the result of complying with applicable federal laws." *Lucky's Detroit, LLC v. Double L Inc.*, No. 09-14622, 2012 WL 1658455, at *3 (E.D. Mich. May 11, 2012). And here, as mentioned above, Johnson testified, and the exhibits showed, that Defendants' products were almost identical to Plaintiff's products, causing market confusion. Fourth, the Court finds that the public interest is served by enforcing the law and "prevent[ing] an infringing party from continuing to confuse and deceive the public." *Id*.

The undersigned recommends that the District Judge enter the proposed injunction [Doc. 77-1 pp. 1–4] with the following modifications. First, the undersigned recommends that the language "or that is likely to dilute the distinctiveness of XS's Power trade dress" be stricken [*See supra* note 8]. Second, the undersigned recommends that 2(c) be modified with respect to the general reference to "bright colors and graphics" so that it reads as follows: "A high-quality 'sticker' type label covering substantially all of the front face (and on some models, the rear face) of the lower housing that feature the particular colors and similar graphics on the XS Power battery models." *See Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 717 (S.D. Tex. 2013) ("However, [the plaintiff] is not entitled to the broad injunction it seeks barring [the defendant] from using any black and yellow color scheme."); *Raffel Sys., LLC v. Man Wah*

*Holdings LTD, Inc.*, No. 18-CV-1765, 2023 WL 3375853, at *26 (E.D. Wis. May 11, 2023) ("Of course any injunction must be narrowly tailored to the infringing conduct.").[11]

5.     **Punitive Damages**

Plaintiff asserts that "[t]he record contains clear and convincing evidence that Fullriver's misconduct was intentional and, most likely, was even calculated and carefully executed" [Doc. 71 p. 34].  Plaintiff states that "[i]t is reasonable to assume that [Defendants'] introduction of the copycat Full Throttle batteries and its introduction of the 16V battery would have only happened after thoughtful deliberation and plannings by its management or governing body" [*Id.*].  Plaintiff states that the award of punitive damages should be proportionate to Defendants' misconduct, which includes:

> (1) its flagrant imitation of XS Power's trade dress, in some cases utilizing XS Power's proprietary tooling; (2) its intentional and cleverly devised efforts to create confusion among consumers by creating a false appearance of some association between the Full Throttle batteries with XS Power batteries; and (3) its continuing breach of its agreements with XS Power including, without limitation, its flagrant and unapologetic breach of the 16V Battery Agreement after more than seven years of consistently performing under such agreement.

[*Id.*].

---

[11]     The Court has also considered recommending that 2(a) and 2(g) of the proposed injunction be stricken given Johnson's testimony that the contrasting color scheme of the lid and lower housing and the recessed groove have some functionality [*See* Doc. 67 pp. 15, 17–18].  But the Sixth Circuit has explained that while not conclusive, "Evidence of aesthetic intent—that the product was designed for an aesthetic purpose—tends to show that a product's design is purely ornamental, incidental, or arbitrary."  *Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 736 (6th Cir. 2018).  Johnson testified that these design features were visually appealing, and it does not appear that these specific design features are "essential to the use or purpose of the article" or affects the cost or quality.  *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).

36

"Punitive damages are appropriate only in the most egregious cases and a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly." *McLemore ex rel. McLemore v. Elizabethton Med. Invs., Ltd. P'ship*, 389 S.W.3d 764, 777 (Tenn. Ct. App. 2012). The Tennessee Supreme Court has defined "clear and convincing" as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992); *see also Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) ("In other words, the evidence must be such that the truth of the facts asserted be 'highly probable.'" (citation omitted)).

Punitive damages may be awarded in breach of contract cases or for conversion. *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 362 (6th Cir. 2018); *Concrete Spaces, Inc. v. Sender*, No. 01A01-9607-CH-00288, 1998 WL 430165, at *7 n.8 (Tenn. Ct. App. July 31, 1998) (explaining that an award of punitive damages for a breach of contract is rare); *see also Knight v. Harris*, No. M201600909COAR3CV, 2018 WL 372211, at *10 (Tenn. Ct. App. Jan. 11, 2018) ("Generally speaking, punitive damages may be allowed in a conversion action when the conversion involves elements of fraud, ill will, malice, recklessness, wantonness, oppression, insult, willful or conscious disregard of the plaintiff's rights, or other aggravating circumstances." (quoting 18 Am. Jur. 2d Conversion § 125 (2004))).[12] Even so, "[i]n Tennessee, there can be no claim for punitive damages alone. Thus, without an award of compensatory damages or any other sort of remedial relief, an award of punitive damages cannot stand." *Jenkins v. Brown,* No.

---

[12] The Court notes that the Lanham Act does not permit a punitive damages award. *Kremer v. Reddit, Inc.*, No. 2:21-CV-00038, 2022 WL 4241273, at *2 (M.D. Tenn. Sept. 14, 2022) ("Likewise, 'the Lanham Act expressly prohibits levying damages that may be classified as a "penalty"' and this includes punitive damages.") (quoting *La Quinta Corp. Heartland Properties LLC*, 603 F.3d 327, 342 (6th Cir. 2010)).

37

M2005–02022–COA–R3–CV, 2007 WL 4372166, at * 13 (Tenn. Ct. App. Dec.14, 2007); *B & L Corp. v. Thomas and Thorngren, Inc.,* 162 S.W.3d 189, 223 (Tenn. Ct. App. 2004) ("[A] party is entitled to recover punitive damages only if there is an award of actual damages"); *Oakley v. Simmons,* 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990) (explaining that punitive damages cannot be awarded absent compensatory or injunctive relief) (citation omitted). [13]

Plaintiff acknowledged that it cannot present any evidence of its damages based on solely on its breach of contract claim [Doc. 71 p. 24]. The only compensatory damages the Court has awarded is for Defendants' conversion of Plaintiff's tooling. But the Court finds that an award of punitive damages is appropriate on this claim. As an initial matter, the Court notes Johnson's testimony was not only unrebutted; it was highly credible. Johnson testified how he spent a year trying to find a manufacturer, which is how he was introduced to Defendants [Doc. 67 p. 10]. He traveled to China to develop a relationship with Defendants, and later gave access to Plaintiff's most popular products, the 16-volt battery, after "establish[ing] a level of trust" [*Id.* at 10, 30]. Plaintiff invested approximately $100,000 on the tooling at Defendants' facility [*Id.* at 67]. Later, Defendants announced the Full Throttle Line [Exh. 11], which utilized Plaintiff's tooling. According to Johnson's unrebutted testimony, Defendants continue to sell the Copycat Batteries,

---

[13] The Court may award punitive damages if the plaintiff obtains an injunction, *Oakley*, 799 S.W.2d at 672, but the TCPA does not allow for an award of punitive damages. *Concrete Spaces, Inc. v. Sender*, No. 01A01-9607-CH-00288, 1998 WL 430165, at *7 (Tenn. Ct. App. July 31, 1998); *see also Taylor v. Unumprovident Corp.*, No. 1:03CV1009, 2005 WL 3448052, at *7 (E.D. Tenn. Dec. 14, 2005) (granting the defendant's motion for summary judgment on the plaintiff's claim for punitive damages under the TCPA because they are not available under the statute); *Dillon v. NICA, Inc.*, No. M2010-02553-COA-R3CV, 2011 WL 6296729, at *10 (Tenn. Ct. App. Dec. 14, 2011) ("Punitive damages are not available for violations of the Tennessee Consumer Protection Act.") (citing *Paty v. Herb Adcox Chevrolet Co.,* 756 S.W.2d 697, 699–700 (Tenn. Ct. App. 1988)).

38

including the 16-volt battery, and will not respond to his request to return the tooling. The Court

therefore recommends that Plaintiff be awarded punitive damages.

In assessing the amount of punitive damages, the Court must consider the following factors,

known as the *Hodges* factors:

1.  The defendant's financial affairs, financial condition, and net worth;

2.  The nature and reprehensibility of defendant's wrongdoing, for example

    (A)  The impact of defendant's conduct on the plaintiff, or
    (B)  The relationship of defendant to plaintiff;

3.  The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

4.  The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

5.  The expense plaintiff has borne in the attempt to recover the losses;

6.  Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

7.  Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

8.  Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

9.  Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges*, 833 S.W.2d at 901–02.

In light of the unrebutted testimony in this case, the Court finds Defendants' actions wrongful, especially given the long-term business relationship of the parties. Defendants have continued to use Plaintiff's tooling to manufacture the Copycat Batteries. While Plaintiff's requested damages are too speculative to make an appropriate compensatory award, Plaintiff presented evidence that it lost business from Defendants' conduct. And the Court agrees with Plaintiff that it is reasonable to infer that Defendants are making a profit from the 16-volt batteries, which are utilized with Plaintiff's tooling, given that they continue to offer them. Defendants are aware of this misconduct, especially in light of this litigation and Plaintiff's request to return the tooling. While the parties entered into settlement negotiations, these eventually broke down, and Defendants stopped participating in this litigation.

But any such award cannot offend due process. *McLemore ex rel. McLemore v. Elizabethton Med. Invs., Ltd. P'ship*, 389 S.W.3d 764, 784 (Tenn. Ct. App. 2012) ("[A] grossly excessive punitive damage award violates a defendant's due process right afforded by the Fourteenth Amendment to the United States Constitution."). "[I]n a case which calls for low compensatory awards, the ratio between compensatory and punitive damages may be greater so that the punitive purpose of such damages may be accomplished." *Id*. (citation omitted). Even so, the Supreme Court has explained that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

In light of the above, and considering Defendants' intentional conduct and refusal to return the tooling, the Court finds an award of $750,000 to be appropriate.[14] *Bridgeport Music, Inc. v.*

---

[14] As noted above, the Court has also considered whether this award is excessive given the recommended amount of compensatory damages. *McLemore*, 389 S.W.3d at 784 ("[A] grossly excessive punitive damage award violates a defendant's due process right afforded by the

*Justin Combs Pub.*, 507 F.3d 470, 488 (6th Cir. 2007) "[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." (quoting *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 585).

### 6. Prejudgment Interest

As explained above, the Court has only recommended a compensatory award on Plaintiff's conversion claim. In light of this recommendation, the Court will analyze Plaintiff's request for prejudgment interest in accordance with Tennessee law. *Mills v. River Terminal Ry. Co.*, 276 F.3d 222, 228 (6th Cir. 2002) ("Where state law claims come before a federal court on supplemental jurisdiction, the award of prejudgment interest rests on state law.").

Tennessee Code Annotated § 47-14-123 provides as follows:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

The Court's decision on whether to award prejudgment interest should be guided by principles of equity, meaning that the award must be "fair, given the particular circumstances of

---

Fourteenth Amendment to the United States Constitution."). But as the Tennessee Court of Appeals explained, "[I]n a case which calls for low compensatory awards, the ratio between compensatory and punitive damages may be greater so that the punitive purpose of such damages may be accomplished." *Id.* (citation omitted); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (explaining that "[a] higher ratio may also be justified in cases in which the injury is hard to detect").

the case." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Prejudgment interest does not operate to "penalize a defendant for wrongdoing" but instead serves to "compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled[.]" *Id*. Other equitable factors in determining whether prejudgment interest should be awarded are as follows:

> (1) promptness in the commencement of a claim, (2) unreasonable delay of the proceedings by either party, (3) abusive litigation practices by either party, (4) the certainty of the existence of an underlying obligation, (5) the certainty of the amount in dispute, and (6) prior compensation for the lost time value of the plaintiff's money.

*Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010). "Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000). Courts have considerable discretion in determining whether to award prejudgment interest. *Poole*, 337 S.W.3d at 791; *see also Newman v. Shelby Cnty. Bd. of Educ.*, No. 216CV02127SHLCGC, 2021 WL 3264307, at *3 (W.D. Tenn. Jan. 27, 2021) ("Awarding prejudgment interest is discretionary, but Tennessee law is presumptively in favor of granting prejudgment interest under the statute.").

The Court has weighed the above factors and recommends that prejudgment interest be awarded to Plaintiff. Here, Plaintiff only seeks prejudgment interest from July 17, 2019 (the date that the lawsuit was filed) through April 13, 2020 (when the case was stayed)—a total of 271 days—and then from March 31, 2022 (when the parties were supposed to participate in a conference with the District Judge), through the date on which the Court enters judgment [Doc. 71 p. 39]. By narrowing its requested temporal scope, Plaintiff has accounted for any delay in filing the lawsuit and the delay attributed to the parties. The Court also finds that the certainty of the existence of an underlying obligation and the certainty of the amount in dispute supports an award

42

of prejudgment interest given Johnson's unrebutted testimony regarding the replacement costs. *Myint*, 970 S.W.2d at 927 ("[T]he test is whether the amount of damages is ascertainable by computation or by any recognized standard of valuation."). And there is no evidence that Plaintiff has been compensated for this amount. Accordingly, the Court recommends an award of 10% prejudgment interest beginning on July 17, 2019, through April 13, 2020 (271 days) and from March 31, 2022, to entry of judgment.

### 7. Attorneys' Fees and Costs

Plaintiff also seeks an award of attorneys' fees under the Lanham Act and the TCPA. Pursuant to the Lanham Act, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117. Under the TCPA, "Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(1).

The Court finds that Plaintiff is entitled to an award of its attorneys' fees under the Lanham Act and the TCPA.[15] With respect to the Lanham Act, the Court finds that this is an exceptional case. The Sixth Circuit Court of Appeals has defined an "exceptional case" pursuant to the Lanham Act as "simply one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 235 (6th Cir. 2019) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "District courts 'determine whether a case is exceptional in the case-by-case exercise of their discretion, considering the totality of the

---

[15] The Court will not analyze Plaintiff's attorneys' fees under the TCPA given its recommendation that attorneys' fees may be awarded under the Lanham Act.

43

circumstances.'" *Id.* (quoting *Octane Fitness, LLC*, 572 U.S. at 554) (citation omitted). "The use of the word 'exceptional' limits the district court's discretion by reserving attorney's fees for 'rare' or 'unusual' cases." *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 478 (6th Cir. 2022), *reh'g denied*, No. 20-3598, 2022 WL 3237492 (6th Cir. Aug. 10, 2022) (citation omitted).[16]

Although the testimony regarding the amount of damages is speculative, the Court finds that Plaintiff's position is strong. Johnson provided credible testimony and exhibits showing the deterioration of the parties' relationship, Defendants' introduction of the Full Throttle lineup, the similarities of the parties' productions, the market confusion, and the loss of customers given Defendants' cheaper products. Defendants failed to rebut this testimony. Under these circumstances, the Court finds an award of attorney's fees will advance considerations of compensation and deterrence.

Further, the Court finds Defendants acted unreasonable in how they litigated this matter. Here, Defendants originally filed the Complaint against Plaintiff. The parties litigated this case and requested a stay to engage in a settlement conference. During the stay, Defendants' counsel moved to withdraw, citing "fundamental differences" and "a lack of contact" with Defendants [Doc. 40]. Defense counsel noted that Defendants were utilizing their attorneys in China to negotiate a settlement [*Id.*]. After Judge Crytzer allowed defense counsel to withdraw, Defendants failed to participate in this case, despite an order directing their new counsel to enter an appearance

---

[16] The Supreme Court further explained that relevant factors to consider include "frivolousness, motivation, objective reasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness, LLC*, 572 U.S. 554 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). District courts have utilized these factors in considering attorney's fees under the Lanham Act. *Graduation Sols., LLC v. Acadima, LLC*, No. 3:17-CV-1342 (VLB), 2020 WL 1528082, at *1 (D. Conn. Mar. 30, 2020). The Court finds these factors helpful in its foregoing analysis.

44

[Doc. 41]. Under these circumstances, an award of attorney's fees is appropriate. *Noco Co. v. Mac Calabur Invs., LLC*, No. 1:21-CV-2173, 2022 WL 2176540, at *5 (N.D. Ohio June 16, 2022) (finding the case to be exceptional because the defendant "had actual notice of its infringing activity yet failed to cease using [the p]laintiff's products or respond to [the p]laintiff's claims"); *CARSTAR Franchisor SPV LLC v. Collision Express of Ohio Inc.*, No. 2:19-cv-3282, 2020 WL 1956988, at *1 (S.D. Ohio Apr. 22, 2020) (finding trademark infringement case exceptional after granting default judgment where defendant willfully infringed and failed to litigate the plaintiff's claims); *see also Taylor Made Golf Co., Inc. v. Carsten Sports, Ltd.,* 175 F.R.D. 658, 663 (S.D. Cal. 1997) (finding that for purposes of award of attorney fees under the Lanham Act, case may be considered "exceptional" where defendant disregards proceedings and does not appear).

The Court will now turn to the requested amount to determine whether it is reasonable. In making this determination, courts often employ the "lodestar method," which is "the proven number of hours reasonably expended on the case by the attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). The reasonableness of the hours and the rate is determined by considering twelve factors:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

*Id.* at 415–16. The most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Id.* at 416 (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)).

45

Plaintiff seeks $80,695.50 in attorneys' fees and $396.72 in costs [Doc. 74 p. 10]. In support of this amount, Plaintiff filed the Affidavit of W. Michael Baisley ("Attorney Baisley") [Doc. 74-1]. Attorney Baisley states that he has been practicing for eighteen (18) years, and his co-counsel, Kyle A. Baisley, has been practicing for fifteen years [*Id.* ¶¶ 2–3]. Attached to Attorney Baisley's Affidavit is a copy of "all statements reflecting the fees and costs incurred by the Plaintiff in connection with this action" [*Id.* ¶ 6]. Attorneys Baisley and Kyle Baisley billed at rates from $295 to $355, and Attorney Mycol E. Scott, an associate billed at $185 per hour. The total time spent in this case was 279.15 hours [*See* Doc. 74 pp. 9–10].

In determining the appropriate hourly rate to apply, the district court must consider the prevailing market rate in the relevant community, which for fee purposes, is the legal community within the Court's territorial jurisdiction or venue. *Brooks v. Invista*, No. 1:05-cv-328, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008) (citing *Adcock-Ladd v. Sec'y of the Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)). The appropriate or reasonable hourly rate "may not, however, exceed the amount necessary to cause competent legal counsel to perform the work required." *Id.* (citing *Coulter v. Tenn.*, 805 F.2d 146, 148 (6th Cir. 1986), *abrogated on other grounds by*, *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016)). A district court may look to "a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Pro. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011).

The undersigned is quite familiar with the prevailing rate for attorneys within the Eastern District of Tennessee. While the Court finds $355 per hour is relevantly high, Plaintiff points out the requested sum "reveals a weighted average hourly rate of $293.59" [Doc. 74]. This weighted

average is reasonable.[17] In light of this weighted average, and no objection from Defendants, the Court recommends that the District Judge allow these hourly rates. *See Loyless v. Oliveira*, No. 1:09-cv-239, 2012 WL 775084, at *2 (E.D. Tenn. Feb.17, 2012) (finding $300 to be a relatively high hourly rate for the Chattanooga legal market but approving the fee in light of no objections), *report and recommendation adopted*, 2012 WL 775070 (E.D. Tenn. Mar. 8, 2012).

The Court has further reviewed the time entries [Doc. 74-1 pp. 4–34]. While the Court notes that there are some entries that appear to be clerical work, [*see, e.g.*, Doc. 74-1 p. 31 (entries for emailing about court dates and putting dates on a calendar)], the undersigned also observes several "no charge" entries [*see, e.g.*, Doc. 74-1 pp. 9, 33]. The Court will therefore not recommend any reductions to the hours incurred in this case. *Ne. Ohio Coal. for the Homeless v. Busted*, 831 F.3d 686, 703 (6th Cir. 2016) ("[I]n assessing fees, district courts are not required to

---

[17] *See Knox Trailers, Inc. v. Clark*, No. 3:20-CV-137-TRM-DCP, 2022 WL 4372350, at *4 (E.D. Tenn. Sept. 21, 2022) (awarding $325 per hour for an attorney who had seventeen years in experience in a case alleging breach of fiduciary duty, intentional interference with business relations, unfair competition, misappropriation of trade secrets, and civil conspiracy); *Knisley v. Johnson*, No. 3:21-cv-420, Doc. 24 (E.D. Tenn. Aug. 10, 2022) (in an unjust enrichment case, awarding an attorney with fourteen years of experience $300 per hour given that he provided no details regarding his professional experience); *ERMC v. Millertown*, 3:19-cv-407 & 408, Doc. 75 (E.D. Tenn. Aug. 1, 2022) (explaining that an attorney who practiced for seven years charged $228.26, $260.60, and $298.90 from 2019 to 2021 in a breach of contract case); *Almanza v. Barr*, No. 3:15-CV-389-TAV-HBG, 2019 WL 13159729, at *9 (E.D. Tenn. Aug. 5, 2019) (recommending an attorney who graduated law school in 2006 but had been practicing employment law for eight years be awarded $260.00 per hour); *Vaughn v. Parkwest Med. Ctr.*, No. 3:15-CV-228, Doc. 117 (E.D. Tenn. Feb. 15, 2019) (recommending award of $290 per hour for worked performed 2014 through 2018 for an attorney who had practiced approximately twelve years), *report and recommendation adopted by* 2019 WL 1290877, at *1 (E.D. Tenn. Mar. 20, 2019); *EEOC v. Dolgencorp, LLC*, No. 3:14-CV-441-TAV-HBG, 2017 WL 9517513, at *5 (E.D. Tenn. Aug. 7, 2017) (recommending $350.00 per hour for a litigator with twenty-four years of experience and $250.00 per hour for an attorney who graduated law school in 2006), *report and recommendation adopted by* 277 F. Supp. 3d 932 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018); *Jones v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, No. 311-CV-00531-PLR-HBG, 2016 WL 4691294, at *1 (E.D. Tenn. Aug. 8, 2016) (recommending award of $345.00 per hour in a civil rights case where the attorney had thirty-eight years of experience), *report and recommendation adopted by* 2016 WL 4690398 (E.D. Tenn. Sept. 7, 2016).

act as 'green-shade accountants' and 'achieve auditing perfection' but instead must simply do 'rough justice.'" (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). The Court recommends that Plaintiff be awarded $80,695.50 in attorneys' fees.

Plaintiff also seeks costs for the court reporter fees ($373.45), milage ($9.17), and parking ($14.10) [Doc. 74-1 p. 34]. In light of no objections, the Court finds these amounts to be reasonable and compensable. *See* 28 U.S.C. § 1920 (fees for printed transcripts necessarily obtained for use are recoverable); *Lankford v. Reladyne, LLC*, No. 1:14-CV-682, 2016 WL 3640691, at *5 (S.D. Ohio June 29, 2016) ("[T]ravel costs, including mileage and parking, were reasonable and appropriately taxed as costs for depositions, the final pretrial conference, and trial."). The Court therefore recommends that Plaintiff be awarded $396.72 in costs.

## IV. CONCLUSION

Based upon these findings and taking all well-pleaded actions in the Counterclaim as true the undersigned **RECOMMENDS**[18] as follows:

1. Plaintiff's Motion for Default Judgment [**Doc. 53**] be **GRANTED IN PART AND DENIED IN PART**.

2. That Defendants be **ADJUDGED** liable for (i) breach of contract, (ii) trade dress infringement in violation of 15 U.S.C. § 1125(a) and common law, (iii) unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a) and common law, (iv) false advertising in violation of 15 U.S.C. § 1125(a), (v) conversion of Plaintiff's property, and (vi) violation

---

[18] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

48

of the Tennessee Consumer Protection Act.

3.  That Plaintiff's Motion to Voluntarily Dismiss Certain Claims [**Doc. 69**] be **GRANTED** and that the following claims be dismissed without prejudice: (i) Count XII, misappropriation of trade secrets, (ii) Count XIII, intentional interference with business relationships, (iii) Count VI, trade dress dilution and injury to business reputation under Tennessee Code Annotated § 47-25-513, (iv) Count X, unjust enrichment, and (v) Count XIV, equitable setoff.

4.  That Plaintiff be awarded $250,000 for Defendants' conversion and that Plaintiff be further awarded 10% prejudgment interest on this amount beginning on July 17, 2019, through April 13, 2020 (271 days) and then from March 31, 2022, to entry of judgment.

5.  That the Plaintiff's Motion for Permanent Injunction [**Doc. 77**] be **GRANTED IN PART AND DENIED IN PART** and that the District Judge entered the proposed injunction [Doc. 77-1 pp. 1–4] but as modified above.

6.  That Plaintiff be awarded punitive damages in the amount of $750,000.

7.  That Plaintiff's Motion to Recover Attorneys' Fees and Costs [**Doc. 75**] be **GRANTED** and that Plaintiff be awarded $80,695.50 in attorneys' fees and $396.72 in costs.

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

49